IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

---

| | |
|---|---|
| Chad Crumbaker, *et al.*, | |
| Plaintiff, | Case No. 2:15-cv-2446 |
| v. | Judge Graham |
| Parking Solutions, Inc., *et al.*, | Magistrate Judge Jolson |
| Defendants. | |

---

PLAINTIFF'S MOTION FOR
FINAL APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT

---

Plaintiff Chad Crumbaker asks that the Court issue an Order approving the class-wide settlement of this lawsuit. Final approval is appropriate in this case, as detailed in the accompanying memorandum in support and attached declaration of counsel.

Plaintiff respectfully requests that the Court enter an Order:

(1) Certifying the settlement class and collective action class;

(2) granting final approval of the Settlement Agreement;

(3) granting approval of the FLSA settlement;

(4) approving the service award for Plaintiff Crumbaker; and

(5) approving Class Counsel's request for fees and costs.

Respectfully submitted,

/s/ Andrew Biller
Andrew Biller (0081452)
Andrew Kimble (0093172)
Markovits, Stock & DeMarco, LLC

3825 Edwards Road, Suite 650
513-651-3700 (Phone)
513-665-0219 (Fax)
(*abiller@msdlegal.com*)
(*akimble@msdlegal.com*)
www.msdlegal.com

Counsel for Plaintiff

Memorandum in Support of Plaintiff's
Motion for Final Approval of Class and Collective Action Settlement

This was a wage and hour case between a class of parking attendants and their employer, Parking Solutions, Inc. Plaintiffs and Defendants have reached a settlement to resolve all of the claims in the case and bring this lawsuit to a close. To date, no class member has objected to the settlement or excluded him or herself from it. This motion asks the Court to approve the settlement. A copy of the Settlement Agreement is attached hereto.

## 1. Case Background

Plaintiff brought this minimum wage and overtime case on behalf of approximately 1,600 hourly valet employees employed by Parking Solutions, Inc. ("PSI"). In his June 24, 2015 Complaint[1] (Doc. 1), Plaintiff alleged that PSI's pay practices violated both the Fair Labor Standards Act and Ohio's wage and hour laws. Plaintiff's claims fall into two broad categories: (1) Deduction Claims, and (2) Tip Credit Claims. In addition, by not paying the wages described above, Plaintiff alleges that he and the class members are entitled to additional damages as described by Ohio's Prompt Pay Act, O.R.C. § 4113.15.

The Deduction Claims allege that Defendants deducted money from class members' paychecks to pay for insurance and uniform costs, at times causing class members' pay to drop below minimum wage. Because these deductions were taken for the employer's benefit, they are minimum wage law violations. *See* 29 C.F.R. § 531.35.

The Tip Credit Claims allege that Defendants failed to properly claim a tip credit from class members' wages because they did not timely distribute certain credit card tips. By failing to

---

[1] A Second Amended Complaint was filed on December 22, 2015. (Doc. 17-1).

allow class members to retain all of their tips, Defendants were not permitted to take a tip credit from class members' wages. *See* 29 U.S.C. § 203(m). This claim was limited to three of Defendants' locations.

### 2. Settlement Negotiations and Terms of Settlement

During early discovery, Defendants provided Plaintiff with detailed spreadsheets of payroll information. After Plaintiff analyzed the spreadsheets, the parties participated in a private mediation with Stephen Watring of Dunlevey, Mahan & Furry. Through a day of mediation and continued negotiations thereafter (the majority of which continued through the mediator), the parties reach an agreement in principal, eventually memorialized by the Settlement Agreement. Prior to entering the Settlement Agreement, Defendants provided Plaintiff with their actual payroll records, which Plaintiff used to verify the accuracy of the previously-received spreadsheet data. Upon confirming the accuracy of the spreadsheet data, the parties entered into the Settlement Agreement. The agreement contemplated the following:

- Defendants agree to pay a gross potential settlement value of $529,071.46 to resolve class members' claims.

- Defendants will pay class members who submit a timely and valid claim form and release. The amount paid to each class member is based on an agreed upon formula based on the claims involved.

- From the gross settlement amount, Defendants will pay a service payment of $4,000.00 to Plaintiff for services provided during this litigation.

- Plaintiff's counsel will seek an award of attorneys' fees and costs equal to 21% of the gross potential settlement value. This amount, $111,105.00, is paid *in addition* to the settlement amount above and, thus, does not reduce the amounts going to class members. Further, it includes the costs incurred by Plaintiff.

- In addition, Defendants will pay the costs of administering the settlement through a third party administrator.

- Settlement funds not paid out of the Settlement amount will remain the property of Defendants.

- Under the Settlement Agreement, class members who do not exclude themselves will release any and all claims, rights, demands, liabilities, and causes of action that were asserted in the lawsuit.

The parties allocated $450,071.46 for the Deduction Claims. Class members who submitted a valid claim form are to receive 275% of their unpaid wages. Under Ohio law, class members could receive 300% of their unpaid wages if they were successful at trial. *See* Ohio Const., Art. II, § 34a. Under the FLSA, class members could receive 200% of unpaid wages if successful at trial.

The parties allocated $48,712 to the Tip Credit Claims. Class members who submit a valid claim form will receive 100% of their unpaid wages resulting from Defendants' losing the ability to claim a tip credit. Though, because more than the allocated $48,712 was claimed, class members will actually receive 74.996% of their unpaid wages. It is worth noting that Defendants only retained approximately $850 in tips across the three locations at issue. In addition to the settlement money, Defendants have already distributed the allegedly improperly retained tips to the class members regardless of whether they filed a claim form in this case. Under Ohio law, the most class members could receive at trial is 300% of their unpaid wages. Under the FLSA, the most class members could receive at trial is 200% of unpaid wages.

The parties have allocated $26,228 for the Prompt Pay Act Claims. Class members who submit a valid claim form will receive $16.58 in addition to whatever other amounts they are entitled to under the Settlement Agreement. Under the Prompt Pay Act, the most class members could potentially be entitled to at trial is either $200 or 6% of unpaid wages. Unlike the FLSA and

Section 34a, entitlement to Prompt Pay Act liquidated damages is more difficult for employees to prove.

In exchange for the above payments, class members agree to release Defendants from the claims raised in this lawsuit. Under the Settlement Agreement, all class members release their FLSA-based and Ohio law-based claims regardless of whether they fill out a claim form and receive payments. Class members who fill out the claim form/release become eligible for the above payments and release Defendants from liability for all of the claims raised in this lawsuit up to and including the end of the class period.

The Court granted the parties' joint motion for preliminary approval of the Settlement Agreement on February 15, 2017. *See* Doc. 39.

### 3. Administration of Notice and Opt In Period

Garden City Group, LLC administered the claims process.

To administer the settlement, the parties first worked together to formulate a list of all putative class members that should receive the Settlement Notice approved by the Court. The class members included two settlement classes:

> (1) All hourly valet employees who worked for Parking Solutions, Inc. in Ohio at any time between June 24, 2012 to December 31, 2015 and who were subject to improper payroll deductions for uniforms or insurance in one or more workweeks. (This class will be referred to as "the Deduction Class.")

> (2) All hourly valet employees who worked for Parking Solutions, Inc. in Ohio at any time between June 24, 2012 to December 31, 2015 who worked at Hollywood Casino in Columbus, Hollywood Casino in Dayton, and/or the Sheraton in Columbus, and whose credit card tips were not timely distributed. (This class will be referred to as "the Tip Credit Class.")

Ultimately, the class totaled approximately 1,586 workers.

Defendants provided Garden City Group with the last known addresses for the workers, and Garden City Group sent the notices to the putative class members via first class mail. When a mailed envelope/notice was returned with a forwarding address or a class member called with an alternative address, Garden City Group resent the Notice to the corrected address. If a notice was returned as undeliverable, Garden City Group ran the putative class members' name/address through the National Change of Address Database, and resent the notice to any new addresses provided by NCOA.

### 4. Settlement Opt-in, Opt-out, and Claims Numbers

The below table summarizes the class members' participation rate in this case:

|  | Numbers of Individuals | Percentage of Total Class |
|---|---|---|
| **Total Class** | 1,586 | 100% |
| **Opt-ins (with valid claims)** | 304 | 19.2% |
| **Opt-ins (with rejected/disputed claims)** | 18 | 1.1% |
| **Opt-outs** | 0 | 0% |
| **Objectors** | 0 | 0% |

The participation rate in this case is in line with other wage and hour cases. *See, e.g.*, Andrew Brundsen, *Hybrid Class Actions, Dual Certification, and Wage Law Enforcement in the Federal Courts*, Berkeley J. Emp. & Lab. L., 269, Vol. 29, p. 294 (2008) (giving empirical data for 21 collective actions and finding that the average opt-in participation rate was 15.71%).

The total amount of money claimed is $174,605.66 (not counting the proposed incentive award of $4,000) out of a possible $529,071.46. This means that approximately 33% of the

available funds were claimed, which is higher than the opt-in rate would indicate. The cause is that people with more valuable claims filed claims compared to those with less valuable claims.

The money that participating class members will receive ranges from $16.60 (someone who had minimal unpaid wages via a Deduction Claim but not Tip Credit Claim) to approximately $7,000 (someone who had both a Deduction Claim and a Tip Credit Claim). The average claim amount is $574.36.

### 5. Disputed and Rejected Claims

In another wage and hour class action, on August 9, 2017, Judge Marbley held that "[u]ntil the fund created by [a] settlement is actually distributed, the court retains its traditional equity powers. These traditional equity powers include the inherent power and duty to protect unnamed, but interested persons." *Castillo, et al. v. Morales, et al.*, S.D Ohio, Case No. 2:12-cv-00650, ECF No. 130, at p. 2 (quoting *Zients v. LaMorte*, 459 F.2d 628, 630 (2d Cir. 1972) (allowing five late claims). Because the Court has a duty to protect unnamed, but interested persons, Plaintiff details, for the Court's consideration, the claims the parties agreed to reject. *Id.* These claims include:

o Two forms did not include either a social security number or a witness signature. The parties agreed to reject those forms under Section 4(D) of the Settlement Agreement, which specifies that a "fully executed" Claim form and Release "includes obtaining a witness's signature or providing the Class Member's social security number." Plaintiff notes that this form of employee verification (witness or social security number) was subject to specific and detailed negotiations, and

the parties agreed that the verification would be required to receive payment under the Settlement Agreement.

o One form was rejected because it did not include a date of execution and, thus, was determined not to be "fully executed."

o Six forms were rejected because the claimants did not include their work locations.

o Six forms were rejected because they were postmarked after the deadline. The deadline was May 12, 2017. The rejected postmarks were May 13 (2), May 22, May 23, May 26, and June 1.

Finally, as the Court is aware, three other claims are in dispute and are the subject of a separate motion for approval.

## 6. Argument in Favor of the Class Settlement

### 5.1 A class action is appropriate in this case.

As an initial matter, the Court should provide final certification to the putative class and final approval of Class Counsel and Plaintiff Crumbaker as class representatives. The arguments for class certification have already been made in this case, and the Court agreed that class certification is appropriate, Class Counsel is adequate, and Plaintiff Crumbaker is an appropriate representative. *See* Doc. 39, Page ID 264-66.

Because nothing has changed in the case with respect to class certification, Plaintiff will not repeat the arguments or Court's decisions here. Instead, Plaintiff simply incorporates those arguments and the Court's prior decisions into this motion and notes that final class certification and appointment of Class Counsel/Plaintiff Crumbaker remain appropriate.

### 5.2    The proposed settlement is fair, reasonable, adequate, and should be approved.

A class action may only be settled with court approval. Fed. R. Civ. P. 23(e). In order to approve a class action settlement, the Court must find that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

Courts look at seven factors when determining whether a settlement is fair, reasonable, and adequate: (1) the risk of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest. *See Bailey v. White*, 320 F. App'x 364, 367 (6th Cir. 2009). All seven factors favor approving the Settlement Agreement.

### 5.2.1    The Settlement Agreement is not the result of fraud or collusion.

There has been no fraud or collusion here. The Settlement in this case was reached after more than a year of litigation, negotiations, and data analysis. After early discovery, the parties pivoted toward a settlement posture. The parties attended mediation on April 11, 2016 in Columbus, Ohio, and relied heavily on private mediator Stephen Watring to reach the Settlement Agreement. "The participation of an independent mediator in settlement negotiations virtually insures that the negotiations were conducted at arm's length and without collusion between the parties." *Bert v. AK Steel Corp.*, Case No. 1:02-cv-467, 2008 WL 4693747, at *2 (S.D. Ohio Oct. 23, 2008). Even after a settlement was reached, the parties still fought on a number of issues, including the proper damages calculation under the settlement. *See* Order, Doc. 39, PAGEID 266 – 269 (Feb. 15, 2017).

Under these circumstances, it is clear that the Settlement Agreement resulted from arms-length negotiations and is not the product of fraud or collusion. This factor weighs in favor of approving the settlement.

### 5.2.2 The complexity, expense, and potential duration of this case merit settlement.

This is a wage and hour case of substantial complexity. Had the parties not reached a compromise, the case could have been litigated for further years and at great expense.

With regard to complexity, wage and hour "claims typically involve complex mixed questions of law and fact" *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 743 (1981). That was certainly true here; the case involved multiple claims, all of which involved complex legal, factual, and damages questions.

Moreover, this case is a hybrid class/collective action. "[C]ourts have recognized that FLSA cases are complex and that 'among FLSA cases, the most complex is the type of 'hybrid' action brought here, where state wage and hour violations are brought as an 'opt out' class action pursuant to [Rule ] 23 in the same action as the FLSA 'opt in' collective action.'" *Febus v. Guardian First Funding Grp.*, LLC, 870 F. Supp. 2d 337, 340 (S.D.N.Y. 2012).

The complexity of this case favors approving the settlement.

The potential expense in proceeding with the case also favors settlement. This is a case which presented complex questions about the interaction between federal and state wage and hour laws, and likely would have required substantial briefing in the area of damages alone. Substantial discovery, including depositions, would have been necessary to establish the individual liability of Aaron Shocket and Robert Rees. Also, if the case were to proceed, because the class members worked for Defendants at three distinct facilities, Plaintiff likely would have

been faced with arguments from the Defendants that the employees at other facilities were not similarly situated to Plaintiff. In sum, the case would be very expensive to bring to trial.

As for duration, the case, at the time the notice period was concluded, was two years old. As noted in the previous paragraph, there was still much discovery to do to address Defendants' anticipated defenses. The potential for appeals could have pushed a final judgment years away. This factor too favors settlement.

### 5.2.3 The discovery conducted was sufficient to calculate damages and gauge the strength of the case.

The proposed settlement in this case came after the parties engaged in substantial paper discovery. Class Counsel was able to use spreadsheet data provided by Defendants to calculate class member damages, and verified the accuracy of the spreadsheet data by reviewing Defendants' actual payroll records. These records were used to calculate class damages and determine the strength of the wage and hour claims. *See* Biller Declaration. While there would certainly need to be more discovery in order to prepare for trial, the discovery produced thus far was sufficient to accurately gauge the risks and rewards of the proposed settlement and calculate damages with a fair degree of certainty. *Id.*

### 5.2.4 Plaintiff's success in this case, though likely, was not certain.

The most important factor to consider when reviewing a settlement is the probability of success on the merits. *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984). The likelihood of success is a gauge "from which the benefits of settlement must be measured." *Id.* Here, there were varying likelihoods of success with respect to each type of claim raised in the lawsuit.

With respect to the Deduction Claims, Class Counsel believes this claim's chance of success was very high. Consistent with the strength of this claim, under the Settlement Agreement, the class members will receive 275% of unpaid wages, or 92% of the maximum amount under Ohio law for this claim. Even still, every claim, no matter how strong, is subject to factors like unexpected judicial decisions, surprising jury dispositions, bankruptcy filings, and a whole host of "unknowables."

The tip credit/tip pool claims are also strong, though subject to fact-based and equitable defenses that increase uncertainty. Accordingly, class members will receive 74.996% of their unpaid wages. This substantial recovery reflects the strength of these claims. It is also a significant benefit to the class members subjected to this claim who, for practical purposes, were only underpaid a total of about $850, all of which was paid back early on in the case. Despite the small amount of improper tip retention, the claim settled for $48,712.

Finally, the class members' entitlement to Prompt Pay Act damages is also strong, but the amount and proper calculation of those damages is unclear. Each class member who completes a claim form will receive $16.58. This amount is greater than 6% of unpaid wages for many class members. As the proper calculation of Prompt Pay Act damages and entitlement to liquidated damages have not been substantially litigated, the success obtained for the class members through the Settlement Agreement might well be greater than what they were awarded at trial, which could be nothing at all.

Here, Plaintiffs obtained a substantial monetary benefit for the class members, particularly in light of the risks of continuing to litigate the case. This factor favors approving the Settlement Agreement.

### 5.2.5     Class Counsel recommends that the Court approve the Settlement Agreement.

Courts give weight to the judgment of experienced counsel. *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1015 (S.D. Ohio 2001). Here, Class Counsel is experienced in both class actions and wage and hour actions. Class Counsel believes this settlement to be fair, reasonable, adequate, and in the best interest of the class members. *See* Biller Dec. ¶ 14.

### 5.2.6     The class members' reaction to the settlement has been positive.

The Court is required to take into account any objections to the settlement. In this case, there have been no timely objections filed, and it is not anticipated that any class member will appear at the fairness hearing to object to the Court's approval of the proposed settlement. Further, no class member has opted-out of the settlement. This weighs in favor of settlement approval.

### 5.2.7     The public has an interest in resolving complex litigation.

The public interest favors the settlement of class action litigation. *See Hainey v. Parrott*, 617 F. Supp. 2d 668, 679 (S.D. Ohio 2007). While this case is not necessarily of broad public interest, the public interest favoring settlement certainly applies here, as the proposed settlement ends potentially protracted litigation. Thus, this factor weighs in favor of approving the proposed settlement.

### 5.2.8 The distribution of settlement proceeds is equitable.

In evaluating the fairness of a class settlement, a court should ensure that the distribution of settlement proceeds is equitable. *Kritzer v. Safelite Solutions, LLC*, No. 2:10-cv-0729, 2012 WL 1945144, at *8 (S.D. Ohio May 30, 2012). This does not mean that the proceeds must be shared on a pro-rata basis, so long as the distribution is "fair, reasonable, and adequate." *Id.*

Here, all class members will receive an amount directly related to how long they worked for Defendants, the deductions taken from their pay, the hours they worked, and whether they were subject to the tip credit claim. In other words, class members will receive an amount that will approximate their actual alleged unpaid wages and damages. This method of distribution is probably the fairest method possible in wage and hour cases.

### 7. Argument in Favor of the Collective Action Settlement

Plaintiffs also request that the Court approve the settlement of their FLSA claims. Unlike the state law claims under Rule 23, FLSA collective actions may only be joined if a class member affirmatively "opts in." Accordingly, FLSA collective actions and settlements do not implicate the same due process concerns as Rule 23 actions. *Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 719 (E.D. La. 2008). Instead, courts focus on whether making sure that the "employer does not take advantage of its employees in settling their claim for wages." *Id.*

Courts approve FLSA settlements when they are reached as a result of contested litigation to resolve *bona fide* disputes. *See Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 n.8 (11th Cir. 1982). Typically, courts regard the adversarial nature of a litigated FLSA case to be an adequate indicator of the fairness of the settlement. *Id.* at 1353-54. If the

proposed settlement reflects a reasonable compromise over contested issues, the Court should approve the settlement. *Id.* at 1354.

As described above, the settlement was the result of litigation and arm's-length negotiation. During the litigation and mediation, Plaintiff and Defendants were represented by lawyers who are experienced in wage and hour law. Because the Settlement Agreement resolves a clear and actual dispute that was contested in litigation and resolved through arm's-length settlement negotiations, it should be approved.

### 8. Argument in Favor of the Service Payment to Plaintiff Crumbaker

The parties have earmarked $4,000 to compensate Plaintiff Crumbaker for his involvement in the case and risk in bringing and continuing with the lawsuit. Service or incentive awards are "common in class action settlement and routinely approved for the simple reason 'to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.'" *Kritzer*, 2012 WL 1945144, at *8 (internal citations omitted).

Plaintiff Crumbaker did all of the things expected of a named plaintiff, including providing information to counsel, meeting and conferring with counsel, attending an all-day mediation, and keeping apprised of the case. Additionally, because this case involves claims for unpaid wages that amount to relatively small violations per person, Plaintiff Crumbaker's willingness to stand up on behalf of his co-workers, even in the face of possible retaliation, has resulted in hundreds of workers being paid their back wages. This is exactly the kind of action that merits a service award and, under the circumstances, $4,000 is perfectly reasonable.

9. **Argument in Favor of the Attorneys Fee Award**

Class Counsel requests a fee and expenses award of $111,105, which amounts to 21% of the gross potential settlement value. The Settlement Agreement contemplates that this amount will be paid in addition to the settlement amounts allocated to the class members and, thus, does not reduce to amounts going to class members.

The Sixth Circuit allows both the "common fund" and "lodestar" approaches to attorneys fees. *In re Cardinal Health Inc. Sec. Litigations*, 528 F. Supp. 2d 752, 761 (S.D. Ohio 2007). The "common fund" approach "encourages efficiency, judicial economy, and aligns the interests of the lawyers with the class." *Id.* at 762.

Fee awards of 30% or greater of the common fund are common in this Circuit. *See, e.g., Castillo v. Morales, Inc.,* No. 2:12-cv-650, 2015 WL 13021899, *8 (S.D. Ohio Dec. 22, 2015) (awarding attorney's fees in the amount of 30% of common fund); *Dillworth v. Case Farms Processing, Inc.*, No. 5:08-cv-1694, 2010 WL 776933, at *7 (N.D. Ohio Mar. 8, 2010) (describing a one-third contingency fee as reasonable and approved in the district in other cases); *Kritzer v. Safelite Solutions, LLC*, No. 2:10-cv-729, 2012 WL 1945144, at *9 (awarding 52% of the total recovery as attorneys' fees in hybrid FLSA/state law case); *In re Foundry Resins Antitrust Litig.,* No. 04-MDL-1638 (S.D. Ohio Mar. 31, 2008) (order awarding a fee of 33 1/3% of a $14.1 settlement); *In re Packaged Ice Antitrust Litig.*, Case No. No. 08-MDL-01952, 2011 WL 6209188, at *19 (E.D. Mich. Dec. 13, 2011) ("Importantly, the requested award of close to 30% appears to be a fairly well-accepted ratio in cases of this type and generally in complex class actions.") (Internal citations omitted); *In re Skelaxin Antitrust Litig.*, Case No. 2:12-cv-83, 2014 WL 2946459, at *1 (E.D. Tenn. June 30, 2014) (finding "the requested counsel fee of one third is fair

and reasonable and fully justified."); *Thacker v. Chesapeake Appalachia*, LLC, 695 F. Supp. 2d 521, 528 (E.D. Ky. 2010) ("Using the percentage approach, courts in this jurisdiction and beyond have regularly determined that 30% fee awards are reasonable."); *Kimmel v. Venture Construction Co.*, Case No. 1:10-cv-01388-RLV (N.D. Ga. 2010) (Dkt. 70) (approving 30% of common fund as attorneys' fees and costs); *Moultry v. Cemex, Inc.*, Case No. 8:07-cv-00453-MSS, Dkt. 145 (M.D. Fla. 2008) (awarding 32.25% of common fund as attorneys' fees); *Kemper v. Rent-A-Center, Inc.*, Case No. 4:00-cv-00435-RH-WCS, Dkts. 14-15 (N.D. Fla. 2000) (awarding 33.33% of common fund approach to plaintiffs' counsel); *In re AremisSoft Sec. Litig.*, 210 F.R.D. 109, 134 (D.N.J. 2002) ("Scores of cases exist where fees were awarded in the one-third to one-half of the settlement fund."); *Erie County Retirees Ass'n v. County of Erie*, 192 F. Supp. 2d 369, 382-83 (38% of common fund was awarded in ADEA case); *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 179-80 (W.D.N.Y. 2005) (almost 40% of $125,000 common fund awarded in a FLSA case); *Gilliam v. Addicts Rehab. Ctr. Fund*, Case No. 05 Civ. 3452, 2008 WL 782596, at *5 (S.D.N.Y. Mar. 24, 2008) (finding it reasonable to award class counsel a fee of one-third of the common fund).

Here, Class Counsel does not seek any distribution from the common fund. Instead, Class Counsel seeks an attorney's fee award that amounts to 21% of the total potential gross settlement amount but is paid separate and apart from the common fund, so as not to reduce the payment amounts made to class members. This fee request is clearly in line with established precedent in this district and around the country.

In determining whether a fee award is reasonable, courts consider (1) the value of the benefit rendered to the class, (2) society's stake in rewarding attorneys who produce such results,

(3) whether the services were undertaken on a contingent fee basis, (4) the value of the services on an hourly basis, (5) the complexity of the litigation, and (6) the professional skill and standing of attorneys involved. *Kritzer*, 2012 WL 1945144, at *9.

 1. The value of the benefit rendered to the class: Here, the benefits received for the class are substantial. Class members who filled out a short claim form were entitled to recover more than the actual deductions for their paychecks or retained tips, in some cases by many multiples.

 As discussed above, the settlement allowed class members to receive a fairly high percentage of their total possible recovery under the most favorable laws: 275% of unpaid wages relating to the Deduction Claims, 74.996% of unpaid wages relating to the Tip Credit Claims, and an additional $16.58 each as damages under Ohio's Prompt Pay Act. By nearly any measure, this is a sizable recovery on behalf of low-wage and vulnerable workers who, but for this settlement, would likely have received nothing.

 2. Society's stake in rewarding attorneys who produce such results: "Society has a stake in rewarding attorneys who achieve a result that the individual class members probably could not on their own." *Kritzer*, 2012 WL 1945144, at *9. "…[W]ithout such a class action, small individual claimants would lack the resources to litigate a case of this magnitude. Attorneys who take on class action matters serve a benefit to society and the judicial process by enabling such small claimants to their claims and resources." *In re Telectronics*, 137 F. Supp. 2d at 1043. Here, but for the efforts of Class Counsel, the benefit created in this case would not have been offered to the class members. This factor is especially relevant in a case such as this, where the harm to each individual class member may have been relatively minor (at least with regard to the Deduction Claims), but was perpetrated on a wide scale.

3. **Whether the services were undertaken on a contingent fee basis:** Class Counsel prosecuted this matter entirely on a contingent fee basis. *See* Biller Dec. ¶¶ 3, 6. In doing so, Class Counsel assumed significant risk of non-payment or underpayment. *See Kritzer*, 2012 WL 1945144, at *9 (noting that some courts consider the risk of non-recovery as "the most important factor in fee determination").

4. **The value of the services on an hourly basis:** "In small cases (such as the one presently before the Court)[2] where the risk of 'excessive' or 'windfall' fees is not great, counsel may rely upon summaries to demonstrate the time and effort that went into litigation." *Dillworth*, 2010 WL 776933, at *8; citing Manual for Complex Litigation (4th) § 14.121. Class Counsel included in his declaration a summary that describes the tasks completed by Class Counsel in this matter.[3] *See* Biller Dec. ¶ 15. Class Counsel also directs the Court generally to the various docket entries which also evidence the substantial amount of work that went into this case.

---

[2] In the *Dillworth* case, which was described as "small," there were approximately 3,000 class members. Here, there are 1,559 class members.
[3] If the Court would find Class Counsel's detailed contemporaneous time records to be of assistance, Class Counsel can provide those records to the Court upon request.

The below chart summarizes the hourly rates and time spent by the various lawyers and support staff and comes from Class Counsel's contemporaneous time records:

| Name | Rate | Time | Total |
|------|------|------|-------|
| Andrew Biller | $400 | 131.60 | $52,640 |
| Christopher Stock | $450 | 27.95 | $12,578 |
| Andrew Kimble | $325 | 3.80 | $1,235 |
| Eric Kmetz | $250 | 1.30 | $325 |
| Paralegal | $80 | 141.9[4] | $11,352 |
| **Total** | | **306.25[5]** | **$78,130** |

The average hourly rate was $255.12, below that in typical wage and hour lawsuits of this complexity, indicating that Class Counsel managed the case efficiently.

It is worth noting that all of the out-of-pocket expenses incurred in this case are simply included in the requested fee award—Class Counsel is not asking for a separate award to compensate Class Counsel for out-of-pocket expenses. Class Counsel's out-of-pocket expenses are approximately $4,142.12 and include things like the court filing fee and private mediation expenses. *See* Biller Dec. ¶ 16.

Thus, excluding reimbursement for out-of-pocket expenses, counsel requests an award of $106,962.88 in fees. This is a 1.369 lodestar multiplier, which is below that in other, similar cases. *See Castillo*, 2015 WL 13021899, at *7 (Finding that a 2.5 lodestar multiplier "is typical of

---

[4] This paralegal time includes 8.4 hours of time from W.B. Markovits. Mr. Markovits is a partner at Markovits, Stock & DeMarco, bills at a rate much higher than $80 but, here, assisted with some data entry work. Plaintiff opted to bill this time as paralegal time.

[5] This time does not include all of the time to draft this motion, attend the hearing, and brief the issue regarding the dispute surrounding three claimants.

lodestar multipliers in similar cases."). Note that the lodestar multiplier will actually be *less* because not all of counsel's time is included in the above amount.

5. The complexity of the litigation: As described above, this case posed substantial complexity. Beyond even the "normal" complexities of hybrid class/collective wage and hour actions, there were complex legal, factual, and damages questions presented by Plaintiff's claims, some of which are addressed above. In light of these challenges, the Settlement Agreement is an excellent result for the class members.

6. The professional skill and standing of attorneys involved: This case required attorneys with expertise in wage and hour law as well as class action law and procedure. The legal and factual issues were deep and complex. Moreover, the class size required a certain amount of resources to handle. Referring to Attorney Andrew Biller, Judge Marbley has explained that "the Court finds that the attorneys were highly skilled. Plaintiffs' counsel have prosecuted many wage-and-hour claims…" *Castillo*, 2015 WL 13021899, *7.

## 10. The Notice

The class notice in this case was reasonable and appropriate. A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard*." Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

The Court previously approved the notice process as fair, and the parties undertook and completed that process without delays or difficulties. The parties have complied with Rule 23(e)(1) by directing notice to all class members in a reasonable manner.

## 11. Conclusion

For the reasons set forth above, the parties respectfully request the Court (1) fully and finally approve the Settlement Agreement; (2) finally certify for settlement purposes the settlement class under the FLSA and Ohio law; (3) finally approve the form, content, and distribution of the Class Notice and Claim Form; (4) approve the service award to Plaintiff; (5) approve Class Counsel's request for fees and costs; and (6) dismiss the litigation with prejudice upon completion of administration.

Respectfully submitted,

_/s/ Andrew Biller_____
Andrew Biller (0081452)
Andrew Kimble (0093172)
Markovits, Stock & DeMarco, LLC
3825 Edwards Road, Suite 650
513-651-3700 (Phone)
513-665-0219 (Fax)
(*abiller@msdlegal.com*)
(*akimble@msdlegal.com*)
www.msdlegal.com

Counsel for Plaintiff

**<u>Certificate of Service</u>**


      The undersigned hereby certifies that this motion was filed electronically and notice of this filing will be sent to all parties by operation of the Court's electronic filing system.


    <u>/s/ Andrew Biller</u>
    Andrew Biller